

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-23-00754-CV

**IN THE INTEREST OF A.J.A.**, A.O.B., M.B., Jr., and M.D.B., Children

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-00236
Honorable Kimberly Burley, Judge Presiding

Opinion by:   Luz Elena D. Chapa, Justice

Sitting:   Luz Elena D. Chapa, Justice
           Beth Watkins, Justice
           Lori I. Valenzuela, Justice

Delivered and Filed: April 17, 2024

AFFIRMED

Appellants A.A. and M.B. appeal the trial court's order terminating their parental rights to their children, A.J.A., A.O.B., M.B., Jr., and M.D.B.[1]  Both parents contend the evidence is legally and factually insufficient to support the trial court's best-interest findings.  We affirm the trial court's order of termination.

### BACKGROUND

The Texas Department of Family and Protective Services filed an original petition seeking an emergency removal order, temporary managing conservatorship of A.J.A., A.O.B., M.B., Jr.,

---

[1] To protect the identity of the minor children, we refer to the parents and the children by their initials.  *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

and M.D.B., and termination of A.A. and M.B.'s parental rights.[2] According to the Department, it had received multiple referrals alleging A.A. and M.B. were exposing the children to domestic violence and drug use, neglecting the children, and living with them in a car. Another referral alleged M.B. was sexually abusing A.O.B. The trial court granted the Department's request to immediately remove the children from A.A. and M.B.'s care and named the Department temporary managing conservator of the children. The Department then placed the children in a shelter before placing A.J.A. and M.D.B. with their maternal aunt and A.O.B. and M.B., Jr. with a family friend.

Following the adversarial hearing, the trial court ordered the parents to submit to a psychological evaluation; attend and cooperate fully in counseling sessions; attend, participate in, and successfully complete parenting classes; submit to and cooperate fully in a drug and alcohol dependency assessment; and comply with any other requirements set out in the Department's service plan. The trial court's order further provided the parents' failure to comply with any of these requirements could result in termination of their parental rights.

The case proceeded to a four-day bench trial, and the trial court heard testimony from several witnesses, including Department caseworkers, the parents' counselors and therapists, A.A., and the children's current placements. After trial, the trial court found by clear and convincing evidence A.A. and M.B. knowingly placed or allowed the children to remain in conditions endangering their well-being as well as failed to comply with specific provisions of a court order. *See* TEX. FAM. CODE § 161.001(b)(1)(D) and (O). It further found termination of their parental rights was in their children's best interest. Both parents now appeal arguing the evidence is legally and factually insufficient to support the trial court's best-interest findings.

---

[2] M.B. is the father of A.O.B., M.B., Jr., and M.D.B. The Department also sought termination of A.J.A.'s father's parental rights, and the trial court ultimately terminated those rights. A.J.A.'s father is not a party to this appeal.

SUFFICIENCY OF THE EVIDENCE

*Standard of Review*

A trial court may terminate a parent-child relationship pursuant to section 161.001 of the Texas Family Code only if it finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and termination is in a child's best interest. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. To determine if this heightened burden of proof was met, we employ a heightened standard of review by judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This heightened standard "guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Under it, the factfinder is the sole judge of the weight and credibility of the evidence, including the witnesses' testimony. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We do not reweigh witness credibility issues, and we "defer to the [factfinder's] determinations, at least so long as those determinations are not themselves unreasonable.'" *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

"When reviewing the sufficiency of the evidence, we apply the well-established [legal and factual sufficiency] standards." *In re J.M.G.*, 608 S.W.3d 51, 53 (Tex. App.—San Antonio 2020, pet. denied) (alteration in original) (quoting *In re B.T.K.*, No. 04-19-00587-CV, 2020 WL 908022, at *2 (Tex. App.—San Antonio Feb. 26, 2020, no pet.) (mem. op.)). In our legal sufficiency review, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was

true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume "the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we do not disregard undisputed evidence even if it does not support the trial court's finding. *Id*. In our factual sufficiency review, we consider the entire record and determine whether, in light of the entire record, any disputed evidence "a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" on the challenged finding. *Id*.

### *Applicable Law*

In Texas, there is a strong presumption a child's best interest is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a trial court must also presume a child's prompt and permanent placement in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a). To determine whether a child's parent can provide the child with a safe environment, a trial court should consider the factors set out in section 263.307 of the Family Code.[3] Courts also apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the

---

[3] These factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307.

programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* Not every factor must be proven for a trial court to find termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. In fact, "[e]vidence of a single factor may be sufficient" for a trial court "to form a reasonable belief or conviction termination is in a child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.).

### *A.A.*

A.A. contends the evidence presented at trial is legally and factually insufficient to support the trial court's best interest finding because the *Holley* factors were "largely ignored at trial." The record shows the trial court heard the following evidence with respect to the following factors.

### 1. The Children's Desires and Plans Held by Current Placements

The Department produced evidence A.J.A., who was fifteen years old during the proceeding, was doing well in her current placement and did not want to live with A.A. Specifically, the trial court heard testimony from A.J.A.'s maternal aunt, who was fostering A.J.A. and M.D.B. The maternal aunt testified at the beginning of the case, A.J.A.'s emotional well-being was in a "horrible" state, and she had to constantly remind A.J.A. she did not have to "parent" M.D.B. She testified A.J.A. also had trouble sleeping when she began living with her, but she sleeps "a lot better now." She testified A.J.A. was a "a very smart girl," and doing well in her classes. She further testified at the beginning of the case, A.J.A. refused to visit A.A., but as the case proceeded, A.J.A. started visiting A.A. occasionally. However, after the visits, A.J.A. would stay angry and reclusive for a couple of days. The maternal aunt further testified she believed her

home was the best place for A.J.A. to live as a normal teenager. The trial court also heard testimony from a Department caseworker, who echoed the maternal aunt's sentiment. Department caseworker Raymundo Molina testified A.J.A. was doing well in her current placement, and the current placement encouraged A.J.A. to participate in activities in which she took an interest. A.A. also testified she believed A.J.A. did not want to return home and live with her.

Turning to the other children, at the time of removal, A.O.B. was three years old, M.B., Jr. was two years old, and M.D.B. was a year old—all too young to express their desires. When, as here, a child is too young to express her desires, the trial court may consider whether the child has bonded with current caregivers, is well cared for by them, and has spent minimal time with the parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The evidence shows A.O.B. and M.B., Jr. were placed together living with a family friend. The family friend testified the children exhibited behavioral issues, and she was currently in the process of finding a play therapist for them. She testified A.O.B. and M.B., Jr. had been moved several times throughout the case, and she wanted to give them a permanent and safe home. Since fostering the children, she believed the children's behavior has improved. She specified A.O.B. was not as "clingy" as she was when she first arrived and M.B., Jr. was not screaming or throwing fits like he first did. Department caseworker Molina further testified the bond between A.O.B. and M.B., Jr. and their foster mother was "a positive one" with the children calling their foster mother "mom" at times.

As to M.D.B., the maternal aunt testified he was in a "really bad" emotional condition when he was placed with her. The maternal aunt testified M.D.B. would "scream and cry all night." She explained "it got less and less" as time passed, but each time M.D.B. visited his parents, "it would start all over again." She further testified M.D.B. was adapting well to her home and building bonds with her children. She testified she and her partner were committed to raising

M.D.B. as well as A.J.A.  Finally, the trial court heard testimony from both placements indicating they planned for the children to maintain contact with one another.

Accordingly, after considering A.J.A.'s desires to remain with her current placement and the younger children's improvement in their current placements, the trial court could have formed a firm belief or conviction it would be in the children's best interest to remain in their foster placements.

## 2. Present and Future Danger to the Children

With regard to present and future danger to the children, the evidence shows A.A. engaged in several incidents of domestic violence against M.B.  "Domestic violence may be considered in analyzing the best interest of the child."  *In re N.M.R.*, No. 04-22-00032-CV, 2022 WL 3640223, at *7 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem op.); *see* TEX. FAM. CODE § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72.  Isriona Vasquez, the investigating caseworker for the Department who assisted with the children's removal, testified the first referral the Department received regarding the children alleged A.A. was the perpetrator of domestic violence. Vasquez testified due to an incident, A.A. had been charged with assault bodily injury and was placed under a no-contact order prohibiting her from contacting M.B.  However, A.A. violated the no-contact order three times during the case, resulting in repeated incarcerations.  In fact, the trial court heard testimony from A.A., who admitted she violated the no-contact order three times and had to go to jail.  A.A. testified the charges were eventually dismissed.  The Department also introduced photographs showing A.A. and M.B. together at a graduation ceremony when the no-contact order was in effect.

Additionally, the Department produced evidence showing A.A. had obtained a protective order against M.B. after he had been arrested for assaulting her during the case; A.A., however, testified she no longer had a protective order against M.B. because the assault case was ultimately

dismissed. Nevertheless, A.A. testified she and M.B. had physical disputes on more than one occasion. Based on this evidence, the trial court could have formed a firm belief or conviction A.A. would continue to ignore the no-contact order and remain in a relationship with M.B. despite their history of assaulting one another, thus repeatedly exposing the children to cycles of domestic violence in the future. *See In re K.V.C.*, No. 04-22-00150-CV, 2022 WL 3639511, at *5–6 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem. op.) (reasoning evidence showing parents were unable to break cycle of domestic violence supported best-interest finding).

The Department also produced evidence it was concerned about A.A.'s drug use. "Evidence of a parent's unstable lifestyle, including habitual drug and alcohol use, can support the conclusion that termination is in the child's best interest." *In re F.M.*, No. 14-18-00384-CV, 2018 WL 4925127, *7 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018, pet. denied) (mem. op.). This is because "[d]rug abuse and its effect on the ability to parent can present an endangering course of conduct." *In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *6 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (mem. op.). Here, Department caseworker Vasquez testified one of the referrals the Department received alleged A.A. was using illegal drugs. Specifically, she testified A.A. had been using methamphetamines and marijuana when the children were removed from A.A.'s care, and A.A. admitted her illegal drug use when confronted with her drug test results. The trial court also heard evidence A.A. failed to complete a drug treatment program and relapsed during the case. Specifically, the Department presented evidence showing A.A. enrolled in a seventy-five-day inpatient treatment program, and her residential counselor testified A.A. participated in the program for only thirty days. He confirmed A.A. admitted to him she was addicted to amphetamines and cannabis, and while she had made some progress during her time in the program, she was not successfully discharged.

The trial court also heard testimony from A.A., who testified she had left the inpatient treatment program early because she was having a "rough time" learning how to cope with losing her children. She further testified after leaving the program, she relapsed and used marijuana and methamphetamines. She added, however, she reengaged in an outpatient treatment program and would complete it in four weeks. As the sole judge of the weight given to the evidence, the trial court could have reasonably formed a firm belief A.A. had not successfully addressed her drug use despite her testimony. *See F.M.*, 2018 WL 4925127, at \*7 (reasoning under standard of review, trial court's best-interest finding terminating parent's rights was not unreasonable despite evidence of mother's progress).

### 3. A.A.'s Compliance with Available Programs and Parenting Abilities

The trial court heard evidence A.A. did not complete the requirements outlined in her court-ordered service plan. "A parent's performance under a service plan is also relevant to several of the *Holley* factors, including the emotional and physical danger to the child now and in the future, parental abilities, and stability." *In re M.L.C.*, No. 04-17-00459, 2017 WL 6597828, at \*6 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.); *see Holley*, 544 S.W.2d at 371–72. It is also relevant to many of the factors outlined in section 263.307(b), such as: "(1) the willingness of the parent to seek out, accept, and complete counseling services, (2) the willingness and ability of the parent to effect[] positive changes within a reasonable time, and (3) whether the parent demonstrates adequate parenting skills." *M.L.C.*, 2017 WL 6597828, at \*6; *see* TEX. FAM. CODE § 263.307(b)(10)–(12).

Here, when asked whether A.A. completed her service plan, Department caseworker Raymundo Molina testified many of the requirements were outstanding, including outpatient treatment, which had been recommended after her drug assessment; individual counseling; and domestic violence classes. According to Molina, A.A. did not consistently engage in individual

counseling or domestic violence classes because she would get arrested at different times during the case. He acknowledged, however, while incarcerated, A.A. attended some individual counseling sessions and completed a domestic violence program offered by the jail, but the program was not the usual service offered by the Department.

Molina further testified A.A. completed her parenting classes and a psychological evaluation, but she did not submit to random drug testing until recently. He testified she missed several of her drug test appointments at the beginning of the case because she was either incarcerated or simply did not show up, suggesting she would not test negative. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs."). He stated as of trial, A.A. had been clean, living on her own in an apartment, and working.

When asked whether he believed termination of A.A.'s parental rights was in the children's best interest, Molina answered he did because A.A. had not shown behavioral changes or addressed any of the Department's concerns about her drug use and propensity to engage in domestic violence. He testified he believed returning the children to A.A.'s care would negatively impact the children. Molina described A.A.'s drug use, ongoing relationship with M.B., and failure to complete services as a pattern of behavior that prevented her from providing a stable environment for her children. Accordingly, the trial court could have reasonably formed a firm belief A.A. failed to comply with her court-ordered service plan and did not exhibit stable parenting abilities, supporting its best-interest finding.

### 4. Summation

When viewing this evidence under the appropriate standards of review, we conclude it is legally and factually sufficient to support the trial court's best-interest finding. Here, the evidence

showing A.A.'s drug use and failure to complete a drug treatment program coupled with A.A.'s

repeated violations of the no-contact order due to her ongoing relationship with M.B. is highly

relevant to multiple *Holley* factors. *See Holley*, 544 S.W.2d at 371-72. The trial court also heard

evidence indicating A.A. failed to complete her court-ordered service plan and the children are

currently improving in placements that plan to adopt them; this evidence is also relevant to multiple

*Holley* factors. *See id*. Thus, contrary to A.A.'s argument that the *Holley* factors were largely

ignored at trial, the Department produced evidence of several factors, and we remain mindful not

every factor must be proven and evidence of one factor is sufficient. *See C.H.*, 89 S.W.3d at 27;

*J.B.-F.*, 2018 WL 3551208, at *3. Accordingly, when viewing all the evidence in the light most

favorable to the best-interest finding, we conclude the trial court could have reasonably formed a

firm belief or conviction termination of A.A.'s parental rights was in the children's best interest.

*See J.F.C.*, 96 S.W.3d at 266. We further conclude any disputed evidence, viewed in light of the

entire record, could have been reconciled in favor of the trial court's best-interest finding or was

not so significant the trial court could not have reasonably formed a firm belief or conviction

termination was in the children's best interest. *See id*. We therefore hold the evidence is legally

and factually sufficient to support the trial court's best-interest finding, and we overrule A.A.'s

sufficiency challenge.[4]

---

[4] Although A.A. identifies a best-interest challenge as her sole issue presented, we note at the end of her analysis section in her brief, she cursorily alleges the evidence is legally and factually insufficient to support the trial court's finding that termination was warranted under Texas Family Code section 161.001(b)(1)(O) or (D). To the extent A.A. raises this challenge, we address it as follows. Only one predicate ground under section 161.001(b)(1) is necessary to support a judgment of termination, and because termination under subsection 161.001(b)(1)(D) may have future implications for a parent, we will address this subsection. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Here, the trial court could have reasonably formed a firm belief that A.A. knowingly placed and allowed the children to remain in endangering conditions based on the evidence showing she engaged in illegal drug use, repeatedly violated the no-contact order, and continued to have physical altercations with M.B. *See In re J.C.*, No. 04-21-00421-CV, 2022 WL 379957, at *2–4 (Tex. App.—San Antonio Feb. 9, 2022, pet. denied) (mem. op.) (holding evidence of continued drug use and exposure to domestic violence as sufficient to support finding that parent violated subsection (D)). Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(D). *See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014) (providing we need not detail evidence when affirming an order terminating parental rights).

***M.B.***

M.B. contends most of the evidence presented at trial focused on A.A. and the evidence concerning him is legally and factually insufficient to support the trial court's best-interest finding. Here, the Department produced the following evidence for the trial court to consider when making its best-interest finding.

## 1. Present and Future Danger to the Children

As described above, the Department presented evidence indicating A.A. and M.B. continued to see each other throughout the case despite their domestic violence history. A.A. testified she and M.B. saw each other several times after the children were removed from their care, and there were multiple incidents in which they assaulted each other. At one point, they were even arrested together at a Walmart; specifically, M.B. was arrested for shoplifting. In addition to the above testimony, the trial court heard testimony from Department caseworker Vasquez and therapist Patricia Boone. Vasquez testified before the children were removed from A.A. and M.B.'s care, the Department had put together a safety plan, which required the children to live with M.B. and a supervising party. At this time, a no-contact order was in place against A.A. Vasquez testified M.B. violated the safety plan by taking the children to Dallas with him to live with his sister without notifying the Department. Vasquez testified M.B. ended up leaving his sister's house with the children after seeing A.A., and together, they moved into a vehicle with the children. Vasquez testified once the Department had found the children, they appeared dirty, unkempt, and restless. She further testified it had looked like the children had not bathed in several days and had a foul odor.

Boone also provided testimony concerning the ongoing relationship between A.A. and M.B. She testified A.A. had told her she and M.B. argued frequently and he "put[] his hands on her." She testified she was not aware if A.A. had successfully obtained a protective order against

M.B., but it was very concerning to her if A.A. and M.B. continued to remain in a relationship. Boone testified she also met with M.B., who told her he was the victim of domestic violence. Accordingly, the trial court could have reasonably concluded M.B.'s willingness to continue to see A.A. despite their violent history would expose the children to emotional and physical danger now and in the future. And to the extent M.B. was the victim, "a parent's continued exposure to the other parent's dangerous conduct is also evidence of endangerment" upon which the trial court could have based its best-interest finding. *See In re A.H.*, No. 04-15-00416-CV, 2015 WL 7565569, at *7 (Tex. App.—San Antonio Nov. 25, 2015, no pet.) (mem. op.).

The trial court also heard evidence concerning M.B.'s illegal drug use. The trial court heard testimony from Lina Bottomley, a chemical dependency counselor, who met with M.B. at an outpatient treatment facility. Bottomley testified M.B. enrolled in outpatient services almost a year after the children were removed from his care. She testified the outpatient program was four months, however, M.B. did not complete it. According to Bottomley, she had three individual sessions with him, and he attended eight group sessions. She testified he admitted he used marijuana, and although she created a treatment plan for him, he did not commit to the program long enough for her to determine whether he could maintain sobriety. M.B. was ultimately unsuccessfully discharged from the treatment program. Thus, the trial court could have formed a firm belief or conviction M.B. did not address the Department's concerns regarding his illegal drug use, supporting its best-interest finding. *See J.J.W.*, 2019 WL 1827591, at *6; *F.M.*, 2018 WL 4925127, *7.

Finally, the trial court heard testimony alleging M.B. sexually abused A.O.B. Department caseworker Vasquez testified the Department had received a referral accusing M.B. of sexual abuse. Vasquez testified A.A. also told her she had concerns M.B. was physically abusive to the children and "sexual abuse was going on." Vasquez testified A.A. took A.O.B. to the hospital so

a full SANE exam could be performed, and the results were not conclusive. Although the results were not conclusive, the trial court could have reasonably found the allegations troubling in making its best-interest finding.

## 2. M.B.'s Compliance with Available Programs and Parenting Abilities

The trial court heard testimony from Department caseworker Molina indicating M.B. failed to complete his court-ordered service plan. Molina testified M.B. participated in parenting and domestic violence classes as well as completed a psychological assessment, but he still had three outstanding services. M.B. did not complete outpatient treatment, submit to random drug testing, or complete individual counseling. Molina testified he addressed these services with M.B., and M.B. stated he was going to re-engage but never did. When asked whether he would have any concerns if the children were returned to M.B.'s care, Molina testified reunification would have a negative effect on the children because it was unclear whether M.B. was still using illegal substances or whether he had addressed his domestic violence issues.

The Department also produced testimony from M.B.'s counselor, Vicky Caylor, showing M.B. was uncooperative and unwilling to make the changes necessary to reunite him with his children. Caylor testified she met with M.B. for seven sessions. During those sessions, he completed a psychosocial evaluation, and she concluded he had situational depression and anxiety; she also concluded he needed help making better decisions as a parent and becoming more responsible as opposed to impulsive. She testified he did not want to engage in conversation about why the Department removed the children from his care, and his refusal to acknowledge the Department's involvement placed the children at a higher risk of being exposed to the same mistakes again. She further testified he had a difficult time making "thoughtful, mindful decisions." After seven sessions, M.B. stopped meeting with Caylor, and Caylor testified because he failed to address the issues that caused the Department to remove the children, she had to

unsuccessfully discharge him. On cross examination, she again testified M.B. "did not really want to address the issues why the children were brought into care," and she would have liked to work with him longer to address the Department's concerns.

With regard to M.B.'s parenting abilities, the Department presented evidence M.B. did not have stable housing. "Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs." *In re S.R.*, 452 S.W.3d 351, 367 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). At the beginning of the case, M.B. went to Dallas with his children to live with his sister and then moved himself and the children into a car to live with A.A. Department caseworker Molina testified during the case, M.B. was temporarily living in an apartment with his uncle.

As to M.B.'s interaction with the children, Molina testified M.B. did not attend all his visitations with the children. However, during the visits he attended, he acted appropriately. Though on one occasion, he brought the children milk even though M.B., Jr. and M.B.D. were lactose-intolerant. Molina testified he had to remind M.B. about the children's lactose intolerance from time to time.

Based on this evidence, the trial court could have reasonably determined M.B.'s failure to complete his service plan, secure stable housing, or consistently visit his children while being mindful to their diets shows he did not exhibit adequate parenting skills or an overall willingness to make the necessary changes to obtain his children's return. Therefore, it could have found termination of his parental rights was in the children's best interest.

## 3. Summation

When viewing this evidence under the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding. M.B.'s contention the Department focused only on producing evidence supporting termination of A.A.'s

parental rights ignores the evidence showing M.B. continued to remain in a relationship with A.A., failed to address his illegal substance use and domestic violence issues, failed to complete his court-ordered service plan, and did not exhibit adequate parenting abilities. This evidence coupled with the evidence showing the children were doing well in their current placements and the placements planned to adopt the children and maintain the children's relationship with one another supports the trial court's best-interest finding. Accordingly, when viewing all the evidence in the light most favorable to the best-interest finding, we conclude the trial court could have reasonably formed a firm belief or conviction termination of M.B.'s parental rights was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266. We further conclude any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant the trial court could not have reasonably formed a firm belief or conviction termination was in the children's best interest. *See id*. We therefore hold the evidence is legally and factually sufficient to support the trial court's best-interest finding, and we overrule M.B.'s sufficiency challenge.

## CONCLUSION

The trial court's order of termination is affirmed.

Luz Elena D. Chapa, Justice